PITTSMONT COPPER CO., APPELLANT, *v.* O'ROURKE, SHERIFF, ET AL., RESPONDENTS.

(No. 3,384.)

(Submitted May 6, 1914. Decided June 8, 1914.)

[141 Pac. 849.]

*Equity—Execution—Injunction—Corporations—Reorganization —Fraud in Law—Parties—Counterclaim—"Subject of Action"—Pleading—Surplusage.*

Equity—Counterclaim—Pleading—Sufficiency.
   1.   In a suit in equity, affirmative matter pleaded as a counterclaim, if sufficient in substance to warrant denial of relief to the plaintiff or to require the imposition of conditions to the granting of the same, will, though defective in form, support a decree.
   [As to setoff, recoupment and counterclaim as distinguished from each other, see note in Ann. Cas. 1914B, 119. As to the law governing right of setoff, see note in 4 Ann. Cas. 88.]

Corporations—Creditors—Definition.
   2.   An employee of a mining company became its creditor on the day on which a cause of action for personal injuries accrued in his favor.

Same—Nonconsenting Creditors—Pleading—Sufficiency.
   3.   An allegation that an employee who had secured a judgment for personal injuries against a mining company had no knowledge of the proceedings leading up to an alleged fraudulent sale of its property and did not assent to them, *held* a sufficient statement that he was a nonconsenting creditor.

Same—Reorganization—Fraud in Law.
   4.   Where a mining corporation, which was largely indebted, agreed that the holder of its bonds should, upon default, buy in the corporate property for a sum much less than its actual value in consideration of giving certain of its creditors stock in the reorganized company and

issuing to the stockholders shares in the latter, the agreement was fraudulent in law as against a nonconsenting creditor, and ineffective to bar his resort to the property in satisfaction of his judgment.

Equity—Equitable Defense—Pleading.

5. In a suit in equity, the mere pleading of an equitable defense, as such, will authorize the granting of whatever affirmative relief the pleader shows himself entitled to, consistent with his pleadings and without regard to his prayer.

Counterclaim—"Subject of Action"—Definition.

6. The words "subject of the action" found in section 6541, Revised Codes, providing *inter alia* that any cause of action in favor of the defendant and against the plaintiff which is connected with the subject of the action may be pleaded as a counterclaim, must be understood to refer to the origin and ground of plaintiff's right to obtain the relief asked, rather than to the thing itself about which the controversy has arisen.

Corporations—Reorganization—Fraud—Parties.

7. A corporation, against which defendant had a claim for personal injuries, entered into a reorganization agreement with the plaintiff corporation, which was the holder of its bonds, the agreement providing that, upon foreclosure of the mortgage to secure the bonds, the property of the original company should be bought in by plaintiff, and that stock in the latter should be issued to the shareholders in the original company. Thereafter defendant recovered a judgment against the original company and attempted to sell, under execution, land which had been owned by it. *Held*, in a suit for an injunction, that a demurrer to defendant's answer alleging a defect of parties, was properly overruled in that defendant was not required to make the old company nor its stockholders, creditors and officers who secured the consent of each corporation to the reorganization, parties, the presence of the plaintiff corporation being sufficient for a complete adjudication of the issues.

Same—Plan of Reorganization—Fraud—Evidence—Sufficiency.

8. Evidence *held* to show that the steps leading up to plaintiff company's acquisition of all the property of the original corporation against which defendant held a judgment for personal injuries, enforcement of which by execution plaintiff sought to enjoin, were had in pursuance of a plan or scheme of reorganization in fraud of the judgment creditor's rights.

Same—Reorganization—Nonconsenting Creditors—Fraud.

9. Proceedings looking to the foreclosure of a mortgage on corporate property, under an agreement by which stockholders of the company, who had assented to a plan of reorganization, should participate in the distribution of shares in the new company, were in fraud of the rights of a nonconsenting creditor.

Same—Fraud—Purchasers for Value.

10. Neither the creditors who participated in the agreement for the reorganization of the old company and accepted stock in the new one in consideration of their claims, nor the new corporation were in the position of innocent purchasers for value, under the circumstances detailed in paragraph 7, *supra*, as against a nonconsenting creditor.

Fraud—Fraud in Law—Pleading and Proof.

11. Charges of actual fraud cannot be established by proof of fraud in law.

Same—Pleading—Surplusage.

12. Where the answer, in a suit to enjoin an execution sale, alleged facts showing that the purchase by plaintiff of property of the judg-

ment debtor was fraudulent in law, allegations that the purchase was fraudulent in fact, which were not supported by the evidence, were properly disregarded as surplusage.

Corporations—Reorganization—Execution—Restraining Sale—Parties.
13. The plaintiff (reorganized) corporation having been the real mortgagee in the mortgage given by the old company to secure its bonds, the trust company—as the nominal mortgagee and *alter ego* of the plaintiff itself—had no interest in the property independently of the persons for whom it held it in trust (the creditors and stockholders of plaintiff), and was therefore not a necessary party to a suit to enjoin an execution sale under a judgment obtained by defendant against the old company, who, in an answer seeking affirmative relief, attacked the validity of the transaction as fraudulent.

*Appeal from District Court, Silver Bow County; J. Miller Smith, a Judge of the First Judicial District, presiding.*

Action by the Pittsmont Copper Company, a corporation, against John K. O'Rourke, as sheriff of Silver Bow county, and another. From an order granting defendants a new trial, plaintiff appeals. Affirmed.

*Messrs. Kremer, Sanders & Kremer,* for Appellant, submitted a brief and one in reply to that of Respondents; *Mr. Louis P. Sanders* argued the cause orally.

The affirmative allegations do not constitute a counterclaim. As between Forsell and the appellant, there is lacking the essential element of privity, and privity between the parties must be shown to authorize the court to entertain a counterclaim. Likewise, there must be mutuality between the parties, and the allegations in question affirmatively disclose absence of this ingredient, which must be shown to exist if a party is successfully to maintain a counterclaim. (*Loewenberg* v. *Rosenthal,* 18 Or. 178, 22 Pac. 601; *Van Arsdale* v. *Edwards,* 24 Okl. 41, 101 Pac. 1123, 1125.) Plaintiff's action is to enjoin a wrongful sale. The claim of the respondent Forsell is based upon a simple money judgment and seeks to secure its satisfaction. It is an action upon a debt. It cannot be counterclaimed as against the plaintiff's cause of action, as this court has pointed out in *Potter* v. *Lohse,* 31 Mont. 91, 77 Pac. 419.

A fundamental rule of equity jurisprudence is that where a bill is filed to affect a fund or property in which different per-

sons have an interest, all the persons interested therein must be made parties. (*Oliver's Exrs.* v. *Palmer,* 11 Gill & J. (Md.) 426, 449; *Wenger* v. *Chicago & E. R. Co.,* 114 Fed. 34, 51 C. C. A. 660; *Le Duc* v. *Brandt,* 110 N. C. 289, 14 S. E. 778.) This so-called counterclaim, when analyzed, is simply a fatally defective endeavor to bring an action in the nature of a creditor's suit, under the guise of a counterclaim, to set aside as fraudulent the transfer of the properties of the Pittsburgh and Montana Copper Company to appellant through the medium of foreclosure proceedings. The essential allegations of the ordinary creditor's suit to set aside a fraudulent transfer must appear in any proceeding that Forsell may attempt to maintain here or that he may in any other proceeding seek to enforce; and the same rules as to parties apply. The assignor is an indispensable party to such a suit, the party by whom the property was conveyed. (*First Nat. Bank* v. *Shuler,* 153 N. Y. 163, 60 Am. St. Rep. 601, 47 N. E. 262; *Le Duc* v. *Brandt,* 110 N. C. 289, 14 S. E. 778; *Bixler* v. *Fry,* 157 Mich. 314, 122 N. W. 119; *Talbott* v. *Leatherbury,* 92 Md. 166, 48 Atl. 733; *Carnahan* v. *Ashworth* (Va.), 31 S. E. 65; *Bevins* v. *Eisman,* 21 Ky. Law Rep. 1772, 56 S. W. 410; *First Nat. Bank* v. *Gibson,* 69 Neb. 21, 94 N. W. 965.) The Pittsburgh and Montana Copper Company—the judgment debtor—is a necessary party. (*Hammond* v. *Hudson River Iron etc. Co.,* 20 Barb. (N. Y.) 378; *Lovejoy* v. *Irelan,* 17 Md. 525, 79 Am. Dec. 667.) "To a bill to vacate a decree the plaintiff in such decree is a necessary party. The want of him as a party is a fatal defect." (*Harwood* v. *Cincinnati etc. R. R. Co.,* 17 Wall. (U. S.) 78, 21 L. Ed. 558; *Ribon* v. *Chicago etc. R. R. Co.,* 16 Wall. (U. S.) 446, 21 L. Ed. 367; 3 Thompson on Corporations, sec. 3310.)

The decree entered in the court of common pleas of Allegheny county of Pennsylvania cannot be collaterally attacked and held for naught in this proceeding. It can only be called into question by Forsell—a creditor of the Pittsburgh and Montana Copper Company, on the ground of fraud in a direct proceeding instituted in a court of competent jurisdiction where all necessary parties are before the court. (*Lee* v. *Figg,* 37 Cal. 328, 99

Am. Dec. 271; *Hodgdon* v. *Southern Pac. R. Co.,* 75 Cal. 642, 17 Pac. 928; *Guggenheim* v. *Wahl,* 138 App. Div. 269, 122 N. Y. Supp. 941; *Hunt* v. *Loucks,* 38 Cal. 372, 99 Am. Dec. 404; *Tilton* v. *Cofield,* 93 U. S. 163, 23 L. Ed. 858.)

Of course, any impairment of the security afforded under the conveyance in question affects the right and interest of the trustee. It is not charged with fraud. If it were, it would be a necessary party. (*Farmers' Loan etc. Co.* v. *Louisville etc. R. Co.,* 103 Fed. 110.) Though not charged with fraud, it is just as essentially a party, for it is admitted it has a valid lien, in no way attached to the property, which is superior to the claimed lien of Forsell's judgment. (*Theriot* v. *Daigle,* 125 La. 363, 51 South. 292; *Thornton* v. *Gaar,* 87 Va. 315, 12 S. E. 753; *Whitman* v. *Union Surety Co.,* 110 Md. 421, 72 Atl. 1042.) It is a general rule of equity that all persons materially interested, either legally or beneficially, in the subject matter of the suit should be made parties thereto, either as plaintiffs or defendants, so that there shall be a decree that shall bind them all and that full justice be done to all in the one suit. (3 Thompson on Corporations, sec. 3310; *Norris* v. *Bean,* 17 W. Va. 655; *United States* v. *Howland,* 4 Wheat. (U. S.) 108, 4 L. Ed. 526; *Wilson* v. *City Bank,* 3 Sum. 422, Fed. Cas. No. 17,797.) "Where a bill is filed in aid of a cause of action against a judgment debtor, all persons claiming any interest in the subject matter are necessary parties." (*Gavazzi* v. *Dryfoos,* 47 Misc. Rep. 15, 95 N. Y. Supp. 199.)

It is not the law that, baldly, the assets of a corporation constitute a trust fund for the payment of creditors' claims. The supreme court of the United States, before the *Boyd Case* was presented to any federal court for determination, had defined precisely what the trust fund doctrine is. After much confusion of ideas as to its real meaning and much conflict of decision in its application, that court finally defined the trust fund doctrine and courts generally have adopted that theory as announced in the leading case of *Hollins* v. *Brierfield Coal etc. Co.,* 150 U. S. 371, 37 L. Ed. 1113, 14 Sup. Ct. Rep. 127. "The expression that the property of a corporation

constitutes a 'trust fund' for its creditors only means that when the corporation is insolvent and a court of equity has taken possession of its assets for administration, such assets must be appropriated to the payment of its debts before distribution to its stockholders, but, as between the corporation itself and its creditors, the corporation does not hold its property in trust or subject to a lien in favor of its creditors in any other sense than does an individual debtor. (*First Nat. Bank* v. *Dovetail Body etc. Co.,* 143 Ind. 550, 52 Am. St. Rep. 435, 40 N. E. 810; *O'Bear Jewelry Co.* v. *Volfer,* 106 Ala. 205, 54 Am. St. Rep. 31, 28 L. R. A. 707, 17 South. 525.) Wisconsin holds, in line with the modern principle of trust funds, that "mere insolvency of a corporation does not convert its property into a trust fund so as to prevent preference." (*Ford* v. *Hill,* 92 Wis. 188, 53 Am. St. Rep. 902, 66 N. W. 115.)

Actual, deliberate and designed fraudulent transactions were relied on by Forsell. He failed to establish that which he set forth. It is elemental that if a party, though needlessly, describe or set forth a cause of action, and the means adopted in effecting it, with minuteness and particularity, and the proof substantially vary therefrom, there is a fatal variance. (*Forsell* v. *Pittsburgh etc. Copper Co.,* 38 Mont. 403, 100 Pac. 218.) Fraud in fact being charged must be proved as alleged. (*Means* v. *Flanagan,* 79 Ill. App. 296.) "When relief is sought on the ground of fraud, it must be clearly proved as alleged and is not lightly to be inferred." (*Bumpus* v. *Bumpus,* 59 Mich. 95, 26 N. W. 410; *Hutchinson* v. *Poyer,* 78 Mich. 337, 44 N. W. 327; *Webb* v. *Darby,* 94 Mo. 621, 7 S. W. 577; *Columbia Sav. Bank* v. *Kingsbury,* 84 Mo. App. 82; *Deepwater Council* v. *Renick,* 59 W. Va. 343, 53 S. E. 552; *Finch* v. *Kent,* 24 Mont. 268, 61 Pac. 653.)

It is the law that plans of reorganization are to be construed in accordance with the same rules which govern in the construction of any other contract. The intention of the parties is to be ascertained and given effect. (2 Clark & Marshall on Corporations, sec. 345d; *Wiggins Ferry Co.* v. *Ohio etc. R. Co.,* 142 U. S. 396, 12 Sup. Ct. Rep. 188, 35 L. Ed. 1055.) Mere proof

of an act is not evidence of a fraudulent purpose. (*Swing* v. *Empire Lumber Co.*, 105 Minn. 356, 117 N. W. 467.)   In so far as the evidence in this case goes, the foreclosure proceedings were, in themselves, free from taint of fraud, and were brought upon a valid claim of indebtedness without connivance on the part of mortgagor, trustee or purchaser.   The purchaser acquired the same perfect title that it would have purchased had there been no plan conceived to prevent foreclosure as against the Pittsburgh and Montana Copper Company.   This title cannot be held to be impressed with any constructive trust in favor of Forsell, and if this be true, the purchaser cannot in any other way be held liable or penalized to pay the judgment Forsell held against the Pittsburgh and Montana Copper Company. (*Hukle* v. *Atchison etc. Ry. Co.*, 71 Kan. 251, 6 Ann. Cas. 83, 80 Pac. 603; *Julian* v. *Central Trust Co.*, 193 U. S. 93, 48 L. Ed. 629, 24 Sup. Ct. Rep. 399; *Columbus S. & H. R. Co. Appeals,* 109 Fed. 177, 48 C. C. A. 275; *Goldmark* v. *Magnolia Metal Co.*, 44 App. Div. 35, 60 N. Y. Supp. 425; *Paton* v. *Northern Pac. R. Co.*, 85 Fed. 838.)   With foreclosure proceedings not consummated as part of any prior arrangement, fully terminated with entry of decree, sale effected and trustee's deeds executed and delivered and filed for record September 20, 1909, we find Forsell with a judgment docketed October 30, following.   There is neither evidence nor law to sustain an argument that the lien of this judgment, under such circumstances, followed the property into the hands of the purchaser.   To so hold would be to read into the record evidence that is not there.   If plaintiff bought a valid title unaffected by Forsell's claimed lien, then it cannot by indirection be compelled to satisfy the judgment out of its funds or otherwise. (*Winter* v. *Iowa Central Ry. Co.*, 111 Iowa, 342, 82 N. W. 760; *Hale* v. *Burlington etc. R. Co.*, 13 Fed. 203, 2 McCrary, 558; *Chicago & O. R. R. Co.* v. *McCammon,* 61 Fed. 772, 10 C. C. A. 50.)

*Messrs. Maury, Templeman & Davies, Mr. Peter Breen* and *Mr. H. K. Jones* submitted a brief; *Mr. Templeman* argued the cause orally.

MR. JUSTICE SANNER delivered the opinion of the court.

Suit in equity by the Pittsmont Copper Company (hereinafter called the plaintiff) against John K. O'Rourke, as sheriff of Silver Bow county, and one Alfred Forsell, to enjoin the sale of certain real property consisting of mines in operation, smelting and concentrating plants and other appurtenances thereto, in execution of a judgment obtained by Forsell against the Pittsburgh and Montana Copper Company (hereinafter called the Montana company), to have said judgment declared not to be a lien upon such property, and to have the levy of execution thereunder declared null and void. The complaint was filed February 10, 1911, and its material allegations are: That the plaintiff is a West Virginia corporation and the owner of the property in question; that on October 30, 1909, Alfred Forsell obtained a judgment for $18,000 damages against the Montana company for personal injuries; that on January 21, 1911, he caused execution upon said judgment to issue commanding O'Rourke, as sheriff, to levy upon and sell all the right, title and interest which the Montana company had in the property on the date of the judgment; that O'Rourke has levied upon and advertised said property for sale, and, unless restrained, will sell the same under said execution, in compliance with the precept and instructions of Forsell; that on October 30, 1909, the Montana company had no right, title or interest in the property or any part thereof, but that the plaintiff then was, and for some time prior thereto had been and still is, the record owner of said property and seised in fee thereof: that the sale thereof under said execution will create a cloud upon the title of the plaintiff, to its great and irreparable injury.

Separate answers were filed. The answer of O'Rourke practically admits all the allegations of the complaint except those relating to ownership and possession of the premises sought to be sold. That of Forsell consists of two parts, *viz.:* The joinder of issue and a further answer which is also denominated a counterclaim. The joinder of issue is substantially the same as in the answer of O'Rourke, coupled with an admission "that

plaintiff claims the present ownership and possession of said premises." The further answer is quite elaborate; but its substance is that on January 16, 1907, Forsell sustained personal injuries through the negligence of the Montana company, a corporation then owning and operating certain mining and smelting properties in the city of Butte; that for these injuries he brought his action on September 10, 1907, and on October 30, 1909, recovered judgment for $18,000 and costs; that he is still the owner of said judgment, which has not been appealed from nor paid; that executions have been issued and returned *nulla bona*, and that the Montana company has no property or assets standing in its own name, but that the assets and properties now standing in the name of the corporation plaintiff, including the property described in the complaint, are "in right and law subject to the claim" of Forsell against the Montana company for the following reasons: On June 1, 1906, the Montana company, for the purpose of securing an issue of bonds amounting to $3,000,000 face value, executed and delivered a mortgage upon all its property, including the property described in the complaint, to the Union Trust Company of Pittsburg, as trustee, and of the bonds so secured $2,216,000 face value were issued. On June 1, 1909, the plaintiff had acquired all the bonds so issued, and the Montana company, which up to that time had fully complied with all the terms of said mortgage, defaulted therein by failing to pay the interest then due upon the said bonds as well as that portion of the principal which then matured, whereupon the plaintiff caused proceedings to be instituted on the 8th day of July, 1909, for the foreclosure of said mortgage, and on August 24, 1909, at the sale under such foreclosure became the purchaser of all the property of the Montana company, then reasonably worth $6,000,000, for the sum of $5,000. It is specifically alleged that the acquisition of the bonds of the Montana company by the plaintiff, the default in the payment thereof by the Montana company, the foreclosure of the mortgage, and the plaintiff's purchase thereunder of all the property of the Montana company occurred pursuant to a plan or scheme for the reorganization of the affairs of the

49 Mont.—19

Montana company, with the consent of all its creditors except Forsell, and under an agreement with its stockholders that they might without further cost exchange their shares of stock in the Montana company for shares of stock in the corporation plaintiff; that the foreclosure and sale thereunder were not intended by the Montana company, or by the plaintiff, or by any of the officers or stockholders of either corporation, to bar or preclude the stockholders of the Montana company from participating and sharing in the properties so acquired by the plaintiff, but that the stockholders of the Montana company did share and participate in such property by the exchange, without further cost, of their stock in the Montana company for stock in the corporation plaintiff; that the value of the stock of the plaintiff so acquired by the stockholders of the Montana company was greatly in excess of the full face value of Forsell's judgment with accrued interest; that he was not a party to any of these transactions and knew nothing thereof, but that they had been consummated at the time he obtained his judgment and with a view to escaping the liability of the Montana company toward him; that the object and effect of said transactions was to enable the stockholders of the Montana company to retain an interest in its properties so acquired by the plaintiff but excluding Forsell, as claimant and creditor, from securing the payment of his claim, and that they were fraudulent and void as to him. The answer concludes with a prayer asking for various affirmative remedies and also for general relief.

A demurrer to the separate answer of Forsell was interposed and overruled. The plaintiff then replied, setting forth its version of the circumstances under which it acquired the property of the Montana company, denying that such acquisition or the transactions leading up to it were in pursuance of any plan or scheme of reorganization, or that there was any fraud therein, or that the purpose or effect thereof was to permit the stockholders of the Montana company to retain an interest or participate in the property so acquired; and it was specifically alleged that the foreclosure occurred solely because of the inability of said company to pay the interest due on June 1, 1909,

upon its bonds, and that at the sale thereunder the plaintiff was the highest and best bidder for the property and paying full value therefor, to-wit, in excess of $2,216,000.

Upon the trial, which was to the court sitting without a jury, the plaintiff presented a formal objection to the introduction of any evidence under the affirmative allegations of Forsell's answer, which was overruled; later, and at the close of the evidence on the part of defendants, plaintiff moved "to dismiss the alleged cause of action set up in the affirmative matter" of Forsell's answer, and this met a similar fate. Findings and conclusion of law were made and filed, and upon them a decree was entered granting to plaintiff all the relief demanded in its complaint, besides forbidding the defendants from asserting any right, title or interest in or to the property in question, or any thereof. In due course defendants presented their motion for new trial, which was granted; and this appeal is by the plaintiff from the order granting a new trial.

Four errors are assigned, which impugn the order appealed from on two grounds: (a) That Forsell's "further answer and counterclaim" had no place in the suit; and (b) that the evidence does not authorize the defendants to prevail or the plaintiff to be denied the relief asked for by it.

(a) The entire argument on the part of plaintiff, so far as the [1] question of pleading is concerned, proceeds upon the theory that the affirmative matter set forth in the answer and pleaded as a counterclaim is defective as to both substance and parties. We do not deem it of importance to ascertain whether the "further answer" states a counterclaim, strictly so called, with all the precision requisite in an action at law. The present proceeding is in equity, and the matter set forth in the "further answer" cannot be ignored if it is sufficient in substance to warrant denial of relief to the plaintiff or to require the imposition of conditions to the granting of the same. (*Davis* v. *Davis,* 9 Mont. 267, 275, 23 Pac. 715; *Anaconda C. M. Co.* v. *Thomas,* 48 Mont. 222, 137 Pac. 380; Bliss on Code Pleading, secs. 383, 390.) Whether the matter so pleaded was sufficient for these purposes, or either of them, was the real question

before the court upon the demurrer to the answer, as well as upon the objection to the introduction of any evidence thereunder. There cannot be the slightest doubt that it was correctly decided, if the facts alleged support the ultimate theory upon which the answer proceeds, *viz.*, that the plaintiff came into the property under such circumstances as to render it answerable to the claim of Forsell, a nonconsenting creditor. The [2] suggestion was made on oral argument that Forsell was not a creditor within the meaning of the rule invoked by him, because his judgment had not been entered when the transfer occurred. There is nothing in this. He became a creditor of the Montana company when, in January, 1907, his cause of action accrued (Rev. Codes, secs. 6222, 6223; 20 Cyc. 421; 14 Am. & Eng. Ency. of Law, 251; *Chalmers* v. *Sheehy*, 132 Cal. 459, 84 Am. St. Rep. 62, 64 Pac. 709); the judgment served to [3] judicially establish that pre-existing fact and to put him into position to assert his right; and, as it is also alleged that he had no knowledge of the proceedings leading up to the sale and did not assent to them, it must be taken as sufficiently pleaded that he was a nonconsenting creditor.

Passing, then, to the allegations of fact, it will suffice here to [4] recall the following: That, prior to the default of the Montana company in the payment of its bonds, these bonds had all come into the hands of plaintiff; that the plaintiff caused the foreclosure of the mortgage given to secure the bonds; that the foreclosure and plaintiff's purchase thereunder occurred pursuant to a plan for the reorganization of the affairs of the Montana company; that such plan was entered into by the plaintiff with the consent of the stockholders of the Montana company and all its creditors except Forsell; that it was a part of such plan to allow the stockholders of the Montana company to exchange their shares in that company for shares of plaintiff's stock; that this plan was carried out, and as a result of it the shareholders were permitted to retain, and did retain, an interest in the property acquired by the plaintiff, of a value greatly in excess of Forsell's claim. Such a transaction constitutes a fraud in law, so far as the nonconsenting creditor is

concerned, and is ineffective to bar his resort to the property in satisfaction of his demand. (*Northern Pac. Ry. Co.* v. *Boyd,* 228 U. S. 482, 57 L. Ed. 931, 33 Sup. Ct. Rep. 554; *San Francisco & Northern Pac. R. R. Co.* v. *Bee,* 48 Cal. 398; *Grenell* v. *Detroit Gas Co.,* 112 Mich. 70, 70 N. W. 413; *Loughlin* v. *United States School Furniture Co.,* 118 Ill. App. 36.)

The answer states an equitable defense; but, unless there is a defect of parties, it has other and larger consequences. In a suit in equity the mere pleading of an equitable defense, as [5] such, will authorize the granting of whatever affirmative relief the party shows himself entitled to, consistent with his pleadings and without regard to his prayer. This is under the rule that when a court of equity has before it all the parties to any difference, and when it has obtained complete jurisdiction of the subject matter, it will finally settle the whole controversy. (*Davis* v. *Davis, supra; Kleinschmidt* v. *Steele,* 15 Mont. 181, 188, 38 Pac. 827; *Anaconda C. M. Co.* v. *Thomas, supra.*) Again, under the statute (Rev. Codes, sec. 6541), any cause of action in favor of the defendant against the plaintiff, or against the person whom the plaintiff represents, which tends to defeat the plaintiff's recovery, and which is connected with the subject of the action, may be pleaded as a counterclaim. [6] The words "subject of the action" have been the object of much refinement of discussion, but it has long been settled in this state that they ought to be understood, "not as relating to the thing itself about which the controversy has arisen, but as referring rather to the origin and ground of the plaintiff's right to recover or obtain the relief asked." (*Collier* v. *Ervin,* 3 Mont. 142; *Potter* v. *Lohse,* 31 Mont. 91, 97, 77 Pac. 419.) Under this rule, it is quite clear that the subject of plaintiff's action is its right, as owner, to enjoy the property in question, free from the levy complained of, free from the threatened sale, and free from any claim on the part of Forsell by virtue of his judgment against the Montana company; and that the ground of Forsell's claim to affirmative relief is his alleged right to make the same levy and sale in execution of the same judgment. Between them there is an inseparable connection. This court has

said that: "Under the rules of practice in a court of equity, the court will hear an equitable defense or counterclaim, connected with the subject matter of the petition, without regard to the provisions of the Code of Civil Procedure above cited." (*Davis* v. *Davis, supra.*)   And the supreme court of the United States declares that: "Where, in a court of equity, an apparent legal burden on property is challenged, the court has jurisdiction of a cross-bill to enforce, by its own procedure, such burden." (*Chicago etc. Ry. Co.* v. *Third Nat. Bank,* 134 U. S. 276, 33 L. Ed. 900, 10 Sup. Ct. Rep. 550.)

There remains the question of parties.   The demurrer and the [7] objection asserted that the Montana company, the Union Trust Company of Pittsburg, the stockholders of the Montana company, the creditors of the Montana company other than Forsell, and the officers who secured the consent of each corporation to the reorganization are all necessary parties.   Except as to the Union Trust Company and the Montana company, there is not even plausibility in this contention.   It is the effect of the reorganization, and not the reorganization itself, that is the subject of assault.   The defendants are endeavoring to reach property, not to fix any personal liability.   It is not the theory of the answer nor an indispensable condition to the award of affirmative relief thereunder that the plaintiff's acquisition of the property is void at large or that the transactions leading up to it are subject to attack from every quarter; but that the plaintiff took the property with an equitable charge upon it, to-wit, Forsell's claim since reduced to judgment.   It certainly does not appear from the answer that the presence of any party, save the plaintiff, is necessary for a complete adjudication of the issues thus presented.   The Union Trust Company of Pittsburg, for instance, was the nominal mortgagee in the mortgage which is foreclosed, but the bonds to secure which the mortgage was given, belonged to the plaintiff, so that it was the real mortgagee; and, when the foreclosure occurred at its direction, the trust company was a mere instrument—an *alter ego*—of the plaintiff itself.   So, too, the supposition that the Montana company is a necessary party proceeds upon a mis-

taken apprehension. As between the two corporations, the proceedings were legal and operated to devest the Montana company of any interest in the property. The interest which it may be said to possess for the purposes of this case is a creation of equity, to aid the excluded creditor in his remedy, but capable of altering the situation of the Montana company in no respect whatever. If the basis of Forsell's claim to affirmative relief were an open, unliquidated demand subject to adjudication as a liability of the Montana company, or if the defendants' object were to set aside the entire transaction as void at large, a different situation would be presented. We are satisfied that the court had before it all the parties needful to a proper adjudication of the cause as presented by the "further answer and counterclaim." (*Blanc* v. *Paymaster Min. Co.*, 95 Cal. 524, 29 Am. St. Rep. 149, 30 Pac. 765; *Homestead Min. Co.* v. *Reynolds*, 30 Colo. 330, 70 Pac. 422; *Schneider* v. *Patton*, 175 Mo. 684, 75 S. W. 155.)

(b) We premise our discussion of the case upon the evidence [8] by remarking that the trial court made findings in substantial accord with the complaint and reply, specifically negativing the allegations of Forsell to the effect that the acquisition of the property of the Montana company by the plaintiff and the proceedings leading up to the same were in pursuance of a plan or scheme of reorganization; that in consequence of such proceedings the stockholders of that company participated or retained any interest in the property so acquired; and that such acquisition of such property was in fraud of the rights of Forsell. Whether the motion for new trial was granted because the court became dissatisfied with the findings, or because it was thought that they did not support the decree as entered, we are unable to tell. At any rate, it is the facts which control, and these we shall state as we deem them established by the evidence, following the findings where we may, and our own deductions where the findings are silent or in our opinion erroneous.

The Montana company was incorporated under the laws of West Virginia in July, 1902, for the purpose of mining and

smelting in Montana; its capitalization, originally $5,000,000, was increased in the same year to $30,000,000, divided into 300,000 shares of the par value of $100 each. Of this, $380,000 was paid in in cash, and the balance, $29,620,000, was issued in exchange for mining properties, including the property affected by this suit, and these properties the company thereafter operated in its own name until July 8, 1909. The plaintiff company was incorporated under the laws of West Virginia on April 21, 1906, as the Pittsburg & Western Copper Company, for the purpose of mining and smelting in Montana; its capitalization was $1,000, divided into 100 shares of the par value of $10 each; but 20 shares were issued to 5 persons, *viz.*, John G. Evans, J. R. Shaughnessy, F. K. Martin, J. A. Lager, and R. T. Rossell, who constituted its entire stockholding body; it possessed no property and conducted no business until the events hereinafter set forth. In the operations of the Montana company from its organization to June 1, 1906, a large amount of indebtedness was incurred, and on that day it authorized an issue of bonds to the amount of $3,000,000, none of which, however, were sold, but they were to the amount of $2,216,000 issued to certain creditors as collateral to demand notes; to secure the payment of these bonds the company executed its trust deed or mortgage to the Union Trust Company of Pittsburg, as trustee. On January 16, 1907, Forsell was injured as the result of negligence of the Montana company, and on September 10, 1907, he commenced his action against it for damages; but this action did not ripen into judgment until October 30, 1909. On October 20, 1907, the plaintiff's name was changed to its present style, Pittsmont Copper Company.

In the meantime, as the result of the panic of 1907, the Montana company became financially embarrrassed, and three persons, to-wit, J. W. Friend, D. C. Noble, and Hay Walker, Jr., appear upon the scene as a creditors' committee, considering its affairs. How the committee came into being, and when their activities began, are not revealed; but on December 2, 1907, we find them proposing a plan of reorganization, so designated by the committee, the salient features of which were: To procure

a charter for a new company; the new company to acquire all
the first mortgage bonds, all the shares of stock, and all the
notes and other obligations of the Montana company, the hold-
ers of which might assent; the new company to authorize bonds
to the amount of $2,500,000, preferred stock $1,000,000, common
stock $10,000,000, and to dispose of the same as follows: (a)
The creditors of the Montana company surrendering the indebt-
edness held by them, together with the bonds of that company
held as collateral security, to receive notes of the new company,
together with its bonds to the face amount of such indebtedness
as security therefor, and also, as a bonus for their assent, to
receive common stock of the new company in an amount equal
to the face of such indebtedness; (b) J. H. Reed to surrender
the indebtedness held by him, and for such, as well as for the
indebtedness for which he had provided his personal collateral,
to receive preferred stock equal at face to the face amount
of all such indebtedness, and a like amount of common stock;
(c) $1,500,000 par value of common stock of the new company
to be issued in exchange for stock of the Montana company;
(d) $5,000,000 par value of common stock of the new company
to be held in reserve for the redemption and retirement of its
bonds.   These bonds to be divided into two series: Series A,
$200,000, and series B, $2,300,000—series A to have priority,
to be delivered to the committee for disposal, the proceeds
thereof to be used to pay the necessary expenses incident to
preserving the property, to provide temporarily for continuing
operations, and to prosecute to a limited extent certain develop-
ment work.   It is also recited that all these bonds would be se-
cured by pledge of all the bonds and stocks of the Montana com-
pany acquired under the plan, and, "in the event that the new
company shall find it practicable to acquire the property of the
Montana company, then the bonds of the new company may be
made a first lien upon such property."   The plan proposed was
satisfactory, and on the same day an agreement was entered into
between the committee, J. H. Reed, and the holders of indebt-
edness of the Montana company, to accept and effectuate it.   It
is worthy of note that in the agreement the plan is character-

ized as "plan of reorganization" no less than eight times; that the committee are authorized and vested with ample power and discretion to carry it out; and that the expenses incurred by the committee in that behalf shall be paid by the new company. It is proper, also, to observe that Mr. Reed was president of the Montana company at this time, and continued to be such during all the ensuing period to which this narrative relates.

The committee set about their work, and on March 26, 1908, made a proposal to the plaintiff in effect the same as set forth in the plan of reorganization above referred to, and containing the following provision: "It is the understanding that your company will set aside 300,000 shares of the full paid, nonassessable, common capital stock of your company, of the par value of $5 each, to be issued to the stockholders of the Pittsburg & Montana Copper Company in exchange, share for share, for the outstanding capital stock of said Pittsburg & Montana Copper Company. The undersigned will turn over to your company for exchange, upon the terms aforesaid, all the shares of the common capital stock of said Pittsburg & Montana Copper Company deposited or hereafter to be deposited with us for such purpose." The proposal of the committee was on March 27, 1908, accepted by the unanimous vote of the five stockholders of plaintiff convened for that purpose, and its directors were commanded to do all things necessary to make the acceptance effectual. Thereupon, by separate resolutions, the stockholders of the plaintiff authorized the increase of its capital stock from $1,000 to $11,000,000, divided into 2,200,000 shares at the par value of $5 each, of which $1,000,000 should be preferred; authorized the issuance of $2,500,000 six per cent bonds; approved the form and execution of a collateral trust agreement relative to said bonds; directed the issuance of its negotiable notes to the amount of $2,061,009.92; authorized the acquisition of the shares of stock in the Montana company by the issuance of plaintiff's common stock on the basis of share for share—all "as provided in the proposition" of the committee. These resolutions were complied with in all respects by the directors and officers of the plaintiff, including the execution of the collateral

trust agreement. This agreement was with the Union Trust Company of Pittsburg, as trustee, and made to date from December 1, 1907; it transferred to the trustee all the bonds and stocks of the Montana company, to be acquired by the plaintiff, for the security and benefit of all persons who might hold the bonds of the plaintiff; it commanded the trustee to transfer to such persons as the committee might designate a sufficient number of shares of the Montana company's stock to qualify such persons to act as directors of that company; it continued the committee in their functions, expressly stipulating that the committee should have the right to vote, as representatives of the plaintiff, all shares of stock subject to the agreement and notwithstanding the transfer thereof in trust, so long as the plaintiff should not be declared in default; it provided that, whenever requested by the committee and by resolution of plaintiff's directors, the trustee should execute its proxy or power of attorney to vote the shares of the Montana company stock subject to the agreement, in favor of the increase or reduction of the capital stock of that company, and that said company might, with the consent of the committee, be merged or consolidated with, or all or any part of its property be sold or conveyed to, the plaintiff; it directed the trustee to extend, renew, sell or execute options for the sale of stocks and bonds of the Montana company subject to the agreement, upon such terms and conditions as the committee and plaintiff's directors might authorize, and fixed the disposition of the proceeds of such sale; and it contained a clause to the effect that, in case of a sale of all or any of the property of the Montana company at any judicial or other sale, the trustee might, and upon demand of the committee should, purchase or permit the plaintiff to purchase such property, using the bonds, stocks, and indebtedness covered by the agreement, to make payment therefor, and, in case of such purchase by the trustee, such steps should be taken as the committee might direct to cause the property to be vested in the plaintiff or in some other corporation organized or to be organized for the purpose.

Pursuant to the proceedings above outlined, there was on May 1, 1908, addressed to the stockholders of the Montana company a notice, signed by its secretary, outlining the substance of the plan above discussed, and it was therein stated that the new company formed to take over the stocks and indebtedness of the Montana company "will be at liberty to collect from the latter company at any time. The creditors, in arranging to form this company, have set aside $1,500,000 of common stock, or 300,000 shares of the par value of $5 each, to be used to acquire the shares of stock of the Pittsburg & Montana Copper Company from those holders who may desire to sell, *viz.*, for each share of stock of the Pittsburg & Montana Copper Company, of the par value of $100 offered, the new company will issue one share of its common stock of the par value of $5. The advantage to stockholders of becoming stockholders in the creditor company is sufficiently obvious. * * * This offer, as above stated, will remain open until June 1st, 1908."

By June 1, 1908, the plaintiff had acquired or contracted for all the bonds of the Montana company, to the face amount of $2,216,000; had acquired unsecured notes of the Montana company to the face amount of $1,084,360.07; had acquired the greater portion of the 264,810 shares of the Montana company stock, which ultimately came into the plaintiff's hands—all as contemplated in the plan and proceedings above mentioned. On July 1, 1908, Mr. Reed became president of the plaintiff, and from this time on the plaintiff and the Montana company possessed the same executive officers, to-wit: J. H. Reed, president; R. T. Rossell, secretary. According to the testimony of these gentlemen, an earnest effort was made during this period and up to June, 1909, with the aid of funds amounting to $188,-550.92, procured by the committee through the sale of plaintiff's series A bonds, to keep the Montana company afloat, to restore it to the status of a profitable concern, and to avoid foreclosure, but in April, 1909, it became apparent that these efforts would be vain. The Montana company had no funds with which to pay the interest and installment of principal due June 1, 1909, upon its bonds, and for this reason was compelled to default,

whereupon, on demand of the committee, one member of which was a director of the Montana company, one member of which was a director of the plaintiff, and one member of which was a director of both companies, the plaintiff required the trustee to foreclose the mortgage given by the Montana company to secure said bonds. Foreclosure was commenced in the court of common pleas of Allegheny county, Pennsylvania, on July 8, 1909; on the same day a receiver was appointed, the Montana company having appeared and confessed the bill. A sale was ordered and later held, and at the sale plaintiff bid in the property valued by it at $6,000,000 for the upset price fixed by the Pennsylvania court, to-wit, $5,000. The plaintiff went into possession and has since operated the property. On September 14, 1909, it executed a "supplemental indenture" with the Union Trust Company of Pittsburg, mortgaging all the property so acquired, as further security for the bonds of plaintiff and pursuant to the collateral trust agreement dated December 1, 1907. The annual statements of the plaintiff as filed up to May 22, 1912, show that all its issued stock, with the exception of $100, was issued in consideration of bonds, promissory notes and stocks of the Montana company. The value of the plaintiff's stock issued to stockholders of the Montana company is vastly in excess of Forsell's claim.

We have thus detailed, with unnecessary elaboration perhaps, the steps leading up to plaintiff's acquisition of the property in question, in order that the statement might furnish its own commentary. It is suggested, however, that the evidence does not establish, but negatives, the existence of any special intent to exclude or defraud Forsell. So much may be granted, and yet the plaintiff is in no wise aided; what was done was intended, and its effect was to exclude Forsell and amounts to a fraud in law upon him. Counsel dispute this and deny that it avails Forsell, if true. They say that there was no scheme of reor- [9] ganization, merely a plan to fund indebtedness; that the foreclosure happened, not as a part of that or any plan, but in spite of the wishes of all concerned and the efforts and advancements of the creditors to prevent it; that there has been

no retention of interest or participation by the stockholders of the Montana company, because the exchange was made before foreclosure; that the foreclosure and the sale thereunder were regular and are beyond attack, and therefore the right of plaintiff is not open to doubt. Such reasoning does violence to both fact and law. Everything that happened was within, and nothing that happened was without, the scope of the committee's plan, and the entire proceedings appear to have been personally conducted by the committee in order to prevent material departures from the plan. We need not question that its primary object may have been to protect the creditors whose assent was procured, and that all concerned may have hoped to avert a foreclosure. Foreclosure was nevertheless contemplated at all times, provisions being made which were afterward followed, to acquire the property in that event, and to mortgage it again as further security for the plaintiff's bonds. It was in view of the fact that the plaintiff should be at liberty to collect from the Montana company at any time, necessarily by foreclosure in case of failure to pay, that the exchange of stock was made, and clearly with the idea that the stockholders who assented should not be excluded from all participation in the property, whatever might betide. The legal result of such a situation is well established, according to the supreme court of the United States, upon the principle: "That stockholders are not entitled to any share of the capital stock nor to any dividend of the properties until all the debts of the corporation are paid." (*Chicago, R. I. & P. Ry. Co.* v. *Howard,* 74 U. S. (7 Wall.) 392, 19 L. Ed. 117.)

The same authority in a later case said: "Assuming that foreclosure proceedings may be carried on to some extent at least in the interests and for the benefit of both mortgagee and mortgagor (that is, bondholder and stockholder), we observe that no such proceedings can be rightfully carried to consummation, which recognize and preserve any interest in the stockholders, without also recognizing and preserving the interests, not merely of the mortgagee, but of every creditor of the corporation. In other words, if the bondholder wishes to foreclose

and exclude inferior lienholders or general unsecured creditors and stockholders, he may do so, but a foreclosure which attempts to preserve any interest or right of the mortgagor in the property after the sale must necessarily secure and preserve the prior rights of general creditors thereof. This is based upon the familiar rule that the stockholder's interest in the property is subordinate to the rights of creditors, first of secured, and then of unsecured creditors. And any arrangement of the parties by which the subordinate rights and interests of the stockholders are attempted to be secured at the expense of the prior rights of either class of creditors comes within judicial denunciation.'' (*Louisville Trust Co.* v. *Louisville etc. Ry. Co.*, 174 U. S. 674, 682, 43 L. Ed. 1130, 19 Sup. Ct. Rep. 827, 830.)

Again: ''Corporations, insolvent or financially embarrassed, often find it necessary to scale their debts and readjust stock issues with an agreement to conduct the same business with the same property under a reorganization. This may be done in pursuance of a private contract between bondholders and stockholders. And though the corporate property is thereby transferred to a new company, having the same shareholders, the transaction would be binding between the parties. But of course such a transfer by stockholders from themselves to themselves cannot defeat the claim of a nonassenting creditor. As against him the sale is void in equity, regardless of the motive with which it was made. For if such contract reorganization was consummated in good faith and in ignorance of the existence of the creditor, yet, when he appeared and established his debt, the subordinate interest of the old stockholders would still be subject to his claim in the hands of the reorganized company. * * * There is no difference in principle if the contract of reorganization, instead of being effectuated by private sale, is consummated by a master's deed under a consent decree.'' (*Northern Pac. Ry. Co.* v. *Boyd, supra.*) To the same effect, see *Central Imp. Co.* v. *Cambria Steel Co.*, 201 Fed. 811, 120 C. C. A. 121; *Farmers' Loan & Trust Co.* v. *Missouri I. & N. Ry. Co.* (C. C.), 21 Fed. 264; *Northern Pac. Ry. Co.* v. *Boyd,*

177 Fed. 804, 101 C. C. A. 18; *St. Louis Trust Co.* v. *Des Moines N. & W. Ry. Co.* (C. C.), 101 Fed. 632; *Central of Georgia Ry.* v. *Paul,* 93 Fed. 878, 35 C. C. A. 639; note, 11 L. R. A. (n. s.) 1125 *et seq.*

The application of these decisions to the case at bar is vigorously challenged. It is said of the *Boyd Case* particularly that it rests upon the trust fund theory, tenable enough in that case because the property was in the hands of a receiver when made the subject of reorganization, but untenable here because the property was not in that situation. The Boyd decision does not postulate the receivership as a factor in the conclusion reached. It determines broadly that, as between stockholders and creditors, the former cannot be preferred by any arrangement whatever, and we see nothing in it to conflict with the case of *Ames & Frost* v. *Heslet,* 19 Mont. 188, 61 Am. St. Rep. 496, 47 Pac. 805, in which the trust fund theory is criticised so far as preferences among creditors is concerned. Our view is succinctly expressed by the supreme court of Iowa in *Luedecke* v. *Des Moines Cabinet Co.,* 140 Iowa, 223, 32 L. R. A. (n. s.) 616, 118 N. W. 456: "We do not recognize the trust fund doctrine to the extent that it has obtained in some of the courts, but are of opinion that corporate creditors are entitled in equity 'to the payment of their debts before any distribution of corporate property is made among the stockholders, and recognize the right of a creditor of a corporation to follow its assets or property into the hands of anyone who is not a good faith holder in the ordinary course of business." Moreover, the property in question was in the custody of the law when it was acquired by the plaintiff, and such acquisition was part of the plan previously agreed upon under which the stockholders who assented were to retain an interest in it. We do not question the validity of the decree of foreclosure, but we look behind it and the mere order of events, and we discern clearly that the proper place of the entire transaction is under the rule announced in the cases cited above.

It is quite true that not all—only thirteenth-fifteenths—of the old stockholders of the Montana company exchanged their

shares in that company for shares of stock in the plaintiff; but it does appear from the record that, of the $6,000,000 of stock issued by the plaintiff, all, save $100, was issued to the stockholders and creditors of the Montana company. The existence of these creditors in the shareholding body of the plaintiff does not make it an innocent purchaser or put them in a position to complain. The supreme court of Pennsylvania in an analogous situation said: "If the corporation had merely changed its name, there could have been no doubt of the continued liability of the property. As already said, a majority of the stockholders in the new company are simply the stockholders of the old company holding as such, and without other consideration. As to these, it has been a mere change of name. As to the other or new stockholders, it appears from the agreed facts that they were creditors of the old company, and hold their present stock solely in consideration of their former claims as creditors. They paid nothing else for it; and they must have known that the new corporation into which they entered in this way was not a new enterprise, * * * but a new turn in the old enterprise, all of whose property was being practically handed over, not to them alone in payment, which they might, perhaps, rightfully have accepted, but to them in conjunction with their late debtors. Under such circumstances, they were bound to take notice of the nature of the transaction, and to know that equity would still regard the property as a trust for the payment of existing debts, and would follow it on behalf of creditors until it should get into the hands of innocent purchasers for value. Such purchasers they were not. The old stockholders were not purchasers for value at all; and the new stockholders were not innocent, for they knew, or were bound to take notice, of the taint in their coadventurers' title." (*Montgomery Web Co.* v. *Dienelt,* 133 Pa. 585, 596, 19 Am. St. Rep. 663, 19 Atl. 428, 430.)

It is insisted, however, that, assuming fraud in law to have been established, it is of no avail to the defendants because Forsell's answer pleads actual fraud, and because, when the evi-

dence was all in, the Union Trust Company of Pittsburg was demonstrated to be a necessary party on account of the mortgage executed by the plaintiff on September 14, 1909.   It is a [11, 12]   fact that some of the allegations of Forsell's answer seem to charge actual fraud, and these, of course, cannot be held established by proof of fraud in law.   (*Finch* v. *Kent,* 24 Mont. 268, 61 Pac. 653.)   In our opinion, however, these allegations may be treated as surplusage, for it is easy to be seen that the theory of the answer is fraud in law, and without these allegations the answer still pleads a state of facts from which the conclusion of fraud in law must flow.   Having supported these, the failure to prove actual fraud is unimportant.   As to the second point, based on the mortgage of September 14, 1909, the answer is not far to seek; the trustee took no better title [13]   than the plaintiff had to give, and, if the property was acquired subject to the charge of Forsell's claim, the mortgage is in the same boat; the trustee as such has no interest independently of the persons for whom it holds in trust, and these are the old creditors of the Montana company (by exchange of their notes and bonds the present creditors and stockholders of the plaintiff), who are not in position to complain; and finally, if the trustee had been a necessary party, our statute afforded the plaintiff the means to have it brought in.

We have carefully considered such other questions as have been raised either directly or incidentally, and we are satisfied from the whole record that the decree, as originally entered, was unjustified.   The court was therefore correct in granting the new trial, and the order appealed from is affirmed.

*Affirmed.*

MR. CHIEF JUSTICE BRANTLY and MR. JUSTICE HOLLOWAY concur.